# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STEEL WORKERS OF AMERICA LOCAL 884, AFL-CIO, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 4:09CV184 CDP |
| LACLEDE GAS COMPANY d/b/a MISSOURI NATURAL GAS COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER

The plaintiff union brought this case seeking to compel arbitration of a grievance. The underlying dispute relates to changes made in 2008 by the employer to health benefits of certain retirees. I conclude that under the prevailing law of this circuit and the undisputed facts, the employer is entitled to summary judgment. The health benefits negotiated under the now-expired 2001 agreement (on which the grievance is based) did not vest before that agreement expired. Because the benefits did not survive the expiration of the 2001 labor agreement, the employer cannot be compelled to arbitrate its post-expiration decision to change these medical benefits.

## **Background**

Defendant Laclede Gas Company[1] and plaintiff United Steel Workers of America, Local 884, AFL-CIO, have a longstanding collective bargaining relationship. The discussions about changes, or potential changes, to retiree health benefits that prompted this lawsuit have been going on for several years. In 2003 Stan LaPlant, an employee who was not yet retired, filed a grievance claiming that changes that were then proposed violated the collective bargaining agreement. Laclede had not actually made a change at that time, and so the parties agreed to postpone arbitration until someone was actually harmed by the change. In June 2008 Laclede did make a change; by then LaPlant was retired and so was affected by the change; the union sought arbitration. I will now set out the somewhat complicated details of this factual background, because the details are important to my resolution of the issues.

Laclede and Local 884 are parties to a collective bargaining agreement in which Local 884 is recognized as the exclusive bargaining agent for all service and maintenance employees. They re-negotiate the collective bargaining agreement every three to four years. Three different agreements covered the time period relevant to this dispute. The "1998 Agreement" was in force from April 15,

---

[1] The defendant is named as both Laclede Gas Company and Missouri Natural Gas Company in the briefs (Missouri Natural is listed as the d/b/a entity in the complaint). In this opinion, I will identify the defendant as Laclede.

1998 to April 14, 2001. It was followed by the "2001 Agreement" which governed the parties' relationship from April 15, 2001 to April 14, 2005. The "2005 Agreement" was valid from April 15, 2005 to April 14, 2009. All three of these agreements have now expired. Each agreement contains similar provisions related to grievances and health benefits.

The 1998, 2001, and 2005 agreements state, in Article I, that Laclede "agrees to and does hereby recognize the Union as the exclusive bargaining agency for all service and maintenance employees of the Company . . . ." Each agreement also includes a grievance procedure, outlined in Article II. Under Step One, the agreements state that, "In the case of any grievance arising under this agreement, the aggrieved employee or employees, the shop stewards or other officers may present said grievance to their immediate supervisor within fifteen (15) working days . . . ." If the parties are unable to settle the matter through the grievance procedure, Local 884 can, within twenty-five days of Laclede's decision in the final step of the grievance procedure, notify Laclede of its intention to take the matter to arbitration. The second-to-last sentence in each agreement states that "[t]ime limitations or steps of the grievance procedure may be waived by mutual consent of the parties."

Each agreement also includes a reference to a corresponding medical plan. In the 1998, 2001, and 2005 agreements, in Article XI, Laclede "agrees to

continue in force and effect . . . the medical benefit plan as amended by the Agreement on numerous occasions . . . ." In the 1998 and 2001 agreements, Laclede agreed "to pay, during the term of [the] agreement, all premiums for the existing medical insurance program." The 2005 agreement changed this, providing that employees would now be required to contribute to the cost of health coverage. The 2005 agreement also included additional language covering "retiree healthcare." This new negotiated language states that early retirees – those employees who had at least five years of employment at the company before turning fifty, and who elected early retirement (retirement before turning 65) – would be responsible for monthly contributions for their health care up until age 65. The 1998 and 2001 agreements made no reference to early retiree medical benefits.

As the agreements state, the medical benefit plans offered to Laclede employees and retirees were amended "on numerous occasions." From May 1, 2001 to July 31, 2003, Laclede offered its employees and retirees a health plan called the Comprehensive Plan or the Laclede Plan. The Comprehensive Plan specifically addresses early retirees. The Comprehensive Plan states that those employees who retired before age 65 would "continue to be eligible for medical expense coverage . . . to the same extent as if [they] had not retired" until they reached the age of 65. The Comprehensive Plan also reserves to Laclede "the

right to amend, modify, revoke or terminate the Plan, in whole or in part, at any time."

When an employee elects early retirement from Laclede, Laclede sends the employee a letter detailing the effect of retirement on their various benefit plans. These letters are referred to by the last name of the Pension Committee representative who signed the letter. For example, from 1998 through 2002, Carol Thurman was the signatory on the letter sent to employees electing early retirement during that time. The "Thurman Letter," states, under medical benefits:

> Your current medical coverage, which is subject to a lifetime maximum of $1,000,000.00, will be continued at no cost to you until age 65, when a supplement to medicare will be provided, also at no cost to you.

Around 2002, Laclede began discussing possible changes to the medical benefit plan it offered to current employees and retirees, such as adding a monthly premium. On July 17, 2002, then-employee Stan LaPlant filed a grievance with Laclede over these proposed changes. The grievance states that the company violated Article XI, Section 1 of the 2001 agreement, by making "changes to insurance mid-contract." That grievance was withdrawn when Laclede indicated to Local 884 that no changes were being made at that time.

On August 1, 2003, Laclede amended the Comprehensive Plan, removing the language that gave early retirees medical coverage "to the same extent as if [they] had not retired." Kim Davis was then the signatory on a letter sent to

employees electing early retirement. In the "Davis Letter," the section on medical benefits states:

> Your medical coverage, which is subject to a lifetime maximum of $2,000,000.00, will continue. No decision has been made by the Company as to when Contract retirees at Missouri Natural will begin paying a monthly premium for this coverage. You will be notified when such a contribution is required. At age 65, a supplement to Medicare will be provided.

Notably, the word "current" was removed from the phrase "your current medical coverage" used in the Thurman letter. This change in language, according to Laclede, reflected the August 1, 2003 change to the Comprehensive Plan.

On November 10, 2003, LaPlant filed a second grievance, almost identical to his first, but addressing the recent changes to the Comprehensive Plan. LaPlant was concerned that when he took early retirement he would not receive the same benefits as if he had not retired. In other words, LaPlant believed that early retirees should, until they turn 65, receive the medical benefits they would have received had they not elected early retirement. In March 2004, Local 884 requested that LaPlant's grievance be taken to arbitration. In its request, Local 884 stated its position that "employees retiring under [the] current contract should maintain health insurance benefits at [the] time of their retirement, that their level of coverage would continue at no charge to them until the age of 65, at which time they would receive a supplement to Medicare, also at no cost to them. The union request[s] that the grievance be taken to arbitration."

Also in March 2004, Laclede sent letters to those retirees who had received the Thurman letter – the group of retirees that took retirement before the August 2003 change to the Comprehensive Plan. Those letters stated that the changes made to their insurance plan since their retirement were being reversed, and that they would be reimbursed for any expenses that they incurred associated with changes to their medical benefits. In other words, the recipients of the Thurman letter were placed back into the plan that was their "current" plan when they retired. Laclede reimbursed the Thurman group for any expenses that they had incurred after the Comprehensive Plan was amended. Laclede based this decision on the language of the Thurman letter, which stated that the retirees' "current medical coverage" would continue until they reached 65. There was no such decision made as to the recipients of the Davis letter.

An arbitration panel was requested for LaPlant's second grievance. However, at that time, Laclede had not made any change to the early retiree medical plan that had actually affected LaPlant or anyone else. Because there had been no change, Laclede and Local 884 agreed to postpone the arbitration. Specifically, they agreed that that "the above arbitration would be postponed indefinitely pending any bargaining unit employee being actually adversely impacted . . . each side will reserve their rights to raise any positions or defenses

that would be appropriate at the time, if any, that the grievance might actually be arbitrated."

LaPlant took early retirement in March 2005. He received the Davis letter. In April 2005, during negotiations for the 2005 labor agreement (the 2001 agreement was set to expire April 14, 2005), the parties agreed to discontinue the Comprehensive Plan for both active employees and early retirees, and made changes to future early retiree health benefits. Under the new collective bargaining agreement, employees could select Healthlink Open Access I (HOA I) or Healthlink Open Access II (HOA II). HOA I provided better benefits than HOA II. In 2005, all early retirees were moved to HOA I, the highest benefit plan available after the Comprehensive Plan was discontinued.

In June 2008, Laclede moved all early retirees from HOA I to HOA II. In September 2008, the early retirees who received the Thurman letter were moved back to HOA I, but the recipients of the Davis letter, including LaPlant, remained in HOA II. Laclede moved the Thurman group back to HOA I because of the language in the Thurman letter providing that the retirees' "current" medical coverage would continue as if they had not retired, at no cost to them. According to Laclede, the Davis group was not returned to HOA I because the Davis letter did not include this language. In October 2008, Local 884's attorney sent a letter to Laclede, claiming that its decision to move the Davis group from HOA I to

HOA II violated the language of the Davis letter and the collective bargaining agreement. Local 884 requested arbitration of LaPlant's 2003 grievance. Laclede refused. Local 884 argues that the essence of the postponed LaPlant grievance is the general principle that Laclede is prohibited from making unilateral changes to retiree healthcare.

## Discussion

The standards for summary judgment are well settled. In ruling on summary judgment, the Court views the facts and inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Both parties have moved for summary judgment, and although they disagree on the interpretation of certain facts, there are no material facts in dispute.

## 1. Standing and Timeliness

Laclede initially argues that the union lacks standing and that the request for arbitration was untimely. I have fully considered both of these arguments and reject them. Because I have concluded that the dispute is not subject to

arbitration, I am providing here only an abbreviated explanation for my rejection of these preliminary arguments.

Local 884 brings this suit under § 301 of the Labor Management Relations Act. Section 301 "grants a district court jurisdiction to compel arbitration under a collective bargaining agreement." *Commc'ns Workers of Am. v. Frontier Commc'ns of Minn., Inc.*, No. 08-650, 2008 WL 3896153 at * 2 (D. Minn. Aug. 19, 2008); 29 U.S.C. § 185. The question of whether a union has standing to seek to compel arbitration of a claim involving retirees under section 301 has not been explicitly decided by the Eighth Circuit Court of Appeals, although in the *Crown Cork* case discussed at length below, the court allowed the case to proceed with the written consent of 653 of the 927 affected retirees. *Crown Cork & Seal Co., v. Int'l Assoc. of Machinists & Aerospace Workers*, 501 F.3d 914 (8th Cir. 2007); *see Frontier*, 2008 WL 3896153, at *3 (noting that the Eighth Circuit has not directly addressed this issue). At least two Circuit Courts of Appeals have have held that a union must obtain retiree consent to bring a claim to compel arbitration on the retirees' behalf. *See Int'l Assoc. of Machinists & Aerospace Workers Local Lodge 2121 v. Goodrich Corp.*, 410 F.3d 204 (5th Cir. 2005); *Rossetto v. Pabst Brewing Co.*, 128 F.3d 538, 541 (7th Cir. 1997). Another circuit rejected the consent requirement but held that a union had standing because the union suffered an injury in fact (the cost and expense of litigation) as well as having associational standing

to sue for injuries to its members. *Int'l Bhd. of Elec. Workers,Local 1245 v. Citizens Telecomms Co. of Cal.*, 549 F.3d 781, 788-89 (9th Cir. 2008). District courts in this circuit have split on the issue along similar lines. *Compare Crown Cork & Seal Co., v. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO,* No. 8:03CV222, 2005 WL 2076542, at *7 (D. Neb. Aug. 26, 2005) (holding that union could pursue arbitration on behalf of retirees who consent to union representation) *with Frontier*, 2008 WL 3896153, at *4 (rejecting consent requirement and finding that a union "has standing to seek to vindicate its own contractual rights" without consent of affected retirees).

Under either theory the union here has standing. It is "axiomatic" that a party to an agreement who negotiated a contract on behalf of a third party has standing to sue to enforce that contract. *Frontier Commc'ns of N.Y., Inc. v. Int'l Bhd. of Elec. Workers,* No. 07 Civ. 10327, 2008 WL 1991096, at *2-4 & n.3 (S.D.N.Y. May 6, 2008) (collecting cases). Laclede made certain contractual promises to Local 884 during negotiations for the 2001 agreement, and agreed to arbitrate certain disputes about those provisions. Local 884 has a right to file suit to compel arbitration of a grievance claiming a violation of that agreement. *Id*. But even if consent is required, Local 884 has received consent from at least one of the affected retirees, LaPlant. I conclude that Local 884 has standing, and therefore I have jurisdiction over this dispute.

I also reject Laclede's argument that the request for arbitration is untimely. The parties' agreement to postpone the arbitration of LaPlant's grievance until a bargaining unit employee was adversely affected had the effect of waiving the timeliness issues here. I am not persuaded by Laclede's argument that no "bargaining unit employee" was adversely affected because LaPlant was retired by the time he was adversely affected. The subject of the grievance was retiree benefits, and so the only people who could ever be "adversely affected" were retirees. Under Laclede's arguments, its agreement to postpone arbitration would have been meaningless, because LaPlant could never be adversely affected until he was retired. The request to arbitrate was timely under the complicated facts presented here.

## 2.    Arbitrability

"Arbitration is a matter of contract, and 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Crown Cork*, 501 F.3d at 912 (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). There is a strong presumption in favor of arbitrability, and "[a]n order to arbitrate . . . should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers*, 363 U.S. at 582-83. LaPlant filed his grievance in 2003, under the 2001 agreement. He, and any other

members of the Davis group retired under the 2001 agreement, and any medical benefits they now claim were created by that agreement. It is this agreement, not the 2005 Agreement, that must be construed in order to decide the issue of arbitrability. *Crown Cork*, 501 F.3d at 916.

"As a general rule, where the contract at issue has expired, the parties are 'released . . . from their respective contractual obligations' and any dispute between them cannot be said to arise under the contract." *Poore v. Simpson Paper Co.*, 566 F.3d 922, 927 (9th Cir. 2009) (quoting *Litton Fin. Printing Div. v. Nat'l Labor Relations Bd.*, 501 U.S. 190, 206 (1991)); *see also Burcicki v. Newcor, Inc.*, No. 02-CV-70230-DT, 2010 WL 1131451 (E.D. Mich. Mar. 23, 2010) ("courts have held that after a collective bargaining agreement expires, 'an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA.'"). However, the termination of a collective bargaining agreement does not automatically extinguish a party's duty to arbitrate grievances arising under the contract. *Nolde Bros. v. Local No. 358, Bakery & Confectionary Workers Union*, 430 U.S. 243, 251 (1977). The Supreme Court has instructed that a grievance arising under a now-expired collective bargaining agreement survives the expiration of that agreement in three situations: (1) where the grievance "involves facts and occurrences that arose before expiration"; (2) "where an action taken after expiration infringes a right that accrued or vested under the agreement";

or (3) "where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Litton,* 501 U.S. at 206. These situations recognize that "an expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied." *Id*. Because LaPlant's grievance relates to an agreement to provide certain retiree health benefits, I must look to whether these benefits vested before the 2001 labor agreement expired and thus survived the termination of the agreement.

To determine arbitrability, I must look at and examine the language of the collective bargaining agreement in order to determine if the retiree health benefits vested. *See Crown Cork*, 501 F.3d 912. It is a general rule that, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *AT&T Techs, Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649 (1986). However, the judicial responsibility to determine the arbitrability of a grievance trumps the general rule to avoid consideration of the merits. *Int'l Bhd. of Elec. Workers, Local 1 v. GKN Aerospace N. Am., Inc.*, 431 F.3d 624, 628 (8th Cir. 2005).

In *Crown Cork* the Eighth Circuit held that an employer did not have a duty to arbitrate a grievance filed over the employer's unilateral changes to early retiree healthcare, when those benefits did not vest before the relevant collective

bargaining agreement expired. 501 F.3d 912, 919 (8th Cir. 2007). The union there sought to compel arbitration of a grievance protesting changes the employer made to the medical plans of early retirees who had already retired. The Eighth Circuit held that the retiree benefits had not vested before the agreement expired, and, as a result, did not survive the expiration of the agreement. *Id*. at 919. As a result, the Eighth Circuit held that the parties did not agree to arbitrate the grievance. *Id*. If, as in *Crown Cork*, the retiree health benefits negotiated here (for the Davis group of retirees) did not survive the expiration of the 2001 collective bargaining agreement, the agreement to provide retiree health benefits is outside the scope of the agreement to arbitrate.

As in *Crown Cork*, the labor agreement here contains language that is inconsistent with vesting. In the 2001 labor agreement, Laclede agrees to pay "during the term of this agreement" all premiums for the existing medical insurance program. In *Crown Cork*, the Eighth Circuit interpreted a similar clause as inconsistent with an intent to vest medical benefits. *Id*. at 917 (interpreting a promise by the company to continue a medical plan "without modification for the life of" the labor agreement to be inconsistent with an intent to vest those health benefits). Laclede's promise to pay the medical premiums only "during the term of" the 2001 agreement is "inconsistent with an intent to vest health benefits for

life." *Id.* (citing *John Morrell & Co. v. United Food & Commercial Workers Int'l Union*, 37 F.3d 1302, 1307 (8th Cir. 1994)).

The language of the health benefit plan under which LaPlant retired also included language inconsistent with an intent to vest those benefits for life. The health benefit plan in *Crown Cork* included a blanket reservation of rights to the employer to unilaterally modify or terminate the plan. *Crown Cork*, 501 F.3d at 918. That reservation of rights stated that the employer "hopes and expects to continue the Plan indefinitely, but reserves the right to change or terminate it in the future, subject naturally, to any outstanding contractual agreements." *Id.* The court in *Crown Cork* held that this language was a "clear reservation of rights" to unilaterally modify retiree health plans that were bargained for under expired labor agreements. *Id.* The Eighth Circuit held that, where the language of the labor agreement did not include affirmative vesting language, "an unambiguous reservation-of-rights provision is sufficient without more to defeat a claim that retirement welfare plan benefits are vested." *Id.* (citing *Stearns v. NCR Corp.*, 297 F.3d 706, 712 (8th Cir. 2002). Here, the Comprehensive Plan included a similar reservation-of-rights clause. Under "Termination of the Plan," the Comprehensive Plan states that Laclede "intends that this Plan will continue indefinitely, but reserves the right to amend, modify, revoke or terminate the Plan, in whole or in part, at any time." Here, as in *Crown Cork*, this language is "sufficient, without

more" to defeat Local 884's claim that the health benefits vested at the time LaPlant retired, or before.

Local 884 has not identified any terms in the labor agreement or the Comprehensive Plan that explicitly vest retiree health benefits. Instead, Local 884 argues that (1) Laclede's "past practice" of providing early retirees with the same healthcare benefits as if they had not retired indicates an intent to vest those benefits; (2) the benefits were accrued rights, worked for over time; (3) the Comprehensive Plan, prior to being amended, included language that guaranteed health benefits "to the same extent as if you had not retired," which vested the rights at that time; and (4)  the reservation of rights clause is contradicted by the language of the Davis letter, informing retirees that their "medical benefits will continue."  In *Crown Cork*, the Eighth Circuit explicitly rejected a vesting argument that the health benefits were "worked towards or accumulated over time" and therefore were accrued rights.  *Id*. at 918.  Following *Crown Cork*, Local 884's identical argument fails here.  *Id*.  Local 884 bases part of its vesting argument on the idea that LaPlant began meeting the requirements for vesting before the Comprehensive Plan was amended in 2003, thus the 2003 amendment did not affect his right to the same medical benefits as if he had not retired.  Because these medical benefits do not vest as rights accrued or worked for over time, this argument for vesting before the 2003 amendment fails.

Local 884's remaining arguments are premised on their claim that there was a longstanding past practice at Laclede that early retirees' medical benefits tracked the medical benefits of active employees. This "past practice," according to Local 884, became a part of the bargaining agreement. If the practice was an unwritten term in the 2001 bargaining agreement, then, according to Local 884, it would be arbitrable under the grievance procedure providing for arbitration of "any grievance arising under this agreement." Even though LaPlant retired in 2005, after the August 2003 change to the Comprehensive Plan removing the "current" language, and after the Comprehensive Plan was eliminated during negotiations for the 2005 agreement, Local 884 argues that the benefits vested as to LaPlant before those changes were made, and thus could not be changed unilaterally by Laclede. Alternatively, Local 884 argues that the past practice guaranteed that retirees would be placed in the highest available medical benefit then available to current employees – and that it is this "right" that vested before the 2001 agreement expired. Laclede disagrees, arguing that the plain language of the bargaining agreement and medical benefits plan, in conjunction with the other evidence, show that there was no vested contractual right to a particular medical benefit plan.

I find that the normal principles of contract interpretation combined with the external evidence cited by Local 884 in support of its vesting argument – past practice, the pre-2003 amendment Comprehensive Plan, and the Davis letter –

show that Laclede had no intent to vest the health benefits.  "In interpreting a collective bargaining agreement it is often necessary to go outside the four corners of the contract itself and examine the agreement history to ascertain the intent of the agreement and determine the rights and duties of the parties."  *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. White Motor Corp.*, 505 F.2d 1193, 1197 (8th Cir. 1974).  Here, the agreement history, considered as a whole, shows that Laclede did not intend for the health benefits to vest for life.

The Davis letter, which removed the "current" language previously included in the Thurman letter, shows an intent not to vest certain benefits in the Davis group, rather than an intent to vest as Local 884 argues.  Laclede amended the Comprehensive Plan in August 2003 to remove the language providing medical benefits to early retirees "to the same extent as if [they] had not retired."  Because the 2001 agreement states that Laclede agrees to continue the medical plan "as amended," the 2003 change was incorporated into the 2001 agreement.  After the 2003 amendment to the Comprehensive Plan, Laclede changed the language of the letter it sent to early retirees.  Consistent with that amendment, the Davis letter removed the word "current."  This shows Laclede's consistent intent not to vest certain health benefits for life.  Laclede's decision to re-instate and reimburse the

Thurman letter recipients is also consistent with the promises Laclede made to that group (to provide their "current" coverage after retirement) in contrast to the promises it made to the Davis group (no promise of "current" coverage) who were not reinstated. While the reservation-of-rights clause in the Comprehensive Plan is "sufficient without more" to show that Laclede did not intend for health benefits to vest for life, I find that the other evidence supports this interpretation as well.

Therefore, "as a matter of law . . . there [is] no contractual agreement[ ] to vest retiree health benefits." *Crown Cork*, 501 F.2d at 919. As a result, the health benefits did not survive the expiration of the 2001 agreement. As in *Crown Cork*, the presumption of arbitrability that normally applies in a labor law context does not apply here. The parties did not agree to arbitrate this dispute, and so Laclede is entitled to summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [#16] is GRANTED.

**IT IS FURTHER ORDERED** that plaintiff's motion for summary judgment [#19] is DENIED.

**IT IS FURTHER ORDERED** that defendant's motion to strike [#28] is DENIED.

**IT IS FURTHER ORDERED** that plaintiff's motion to amend [#34] and plaintiff's motion to strike [#32] are GRANTED.

A separate judgment in accord with this Memorandum and Order is entered today.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 15th day of September, 2010.